at L. Mr. Berman for the appellants, Mr. Gallo for the appellees. May it please the Court, Steve Berman on behalf of the appellants. The ATM restraints at issue here are commitments by every bank operator of ATM machines that they will not charge a consumer a lower access fee than that fee set by Visa or MasterCard. This is a naked price restraint, and it's a basic tenet of antitrust law that price fixing always causes injury in the form of higher prices and reduced competition. As one court put it, the downward In this case, those injured by this restraint have stepped forward. They have paid an overcharge or a higher net access fee, and they have standing. So I'd like to start with the standing issue. And then I'll go to whether there was an agreement. You know, you have a limited amount of time, and you may want to spend it on the agreement. On the agreement. Might be better. Yeah, very well. Okay. Unless my colleagues have specific questions about standing, I think that would be a more productive use of your time. Very well. My arguments on standing were brilliant, but I'll move on to the agreement. First, we allege that there was a horizontal agreement, and there is no dispute that the origin of the price restraint is at a time when the Visa bank members were all part of the Visa MasterCard Association. That's when the agreement was entered into. This is not a case where you have to infer there's an agreement. There's agreement right before you. We've cited it. So we have an agreement. So the real issue that's been raised by the opposition is, well, post-IPO, we're a different structure, and therefore, there's no agreement. And our answer to that is the following. First of all, there's no dispute there was an agreement, and the restraints were part of the agreement. In order for there to be no continuing agreement, there has to be, in our view, withdrawal. The agreement's in place. They're all members. They're all still enforcing it. They're all living by it. They haven't withdrawn from the agreement. And withdrawal requires some steps to disavow themselves and to stop receiving the benefits of the agreement. There's nothing in the complaint or in the record to suggest that any of the member banks have disavowed themselves. And in fact, it makes no economic sense for them to do so, because they're not going to withdraw from the agreement unless they know other banks will also withdraw from the agreement. Because, well, I said that wrong. The fact that they haven't withdrawn indicates that it's not in their independent interest to withdraw from the agreement, because they want to participate and maintain the benefits of the conspiracy. Because look at what's happened in the marketplace. There is no competition for access fees, because no consumers get a choice. And so Visa and MasterCard are able to continue to impose high network access fees on the ATM operators. And in fact, we have that chart in the complaint that shows that Visa and MasterCard are at five or six times the level of their fees that they impose on the ATMs. There's no incentive for them to get out of the agreement. And you can infer continuation, because they keep on reaping the benefits of those higher fees. So our number one point, there was an agreement, there was no withdrawal. So we have a horizontal agreement. But even if we didn't have a horizontal agreement, we ledged an alternate theory that I think should have been sustained, which was never properly addressed by the district court, and that is... Your point isn't that the banks somehow, through their equity interest in Master and Visa, and their membership on the board, control Master. That's not your argument, right? Control Visa and Master. No, my point is it's not a control issue. As the American Needle case said, that you don't look at the formula of the parties, you don't look at the label that they put themselves under. You look at the following. The question is whether the agreement joins together independent centers of decision-making. And that's what the agreement did pre-IPO, and that's what it does post-IPO. It has joined together the decision-making of banks... But you agree there's no post-IPO agreement, right? There is no post-IPO agreement. But because the agreement stays in force, the independent decision-making under American Needle of those banks is still joined together, and it's not being exercised... Well, you must think that there is a post-IPO agreement. No? There is by inference, yes. The agreements are still in place, right? And so they're the banks that withdraw on. So they all know that in order for other banks to be part of the network, they have to sign the restraints. So there's a logical inference that every bank knows that the other banks are participating and continuing in the agreement. So was it an inference agreement before the IPO? Well, they're all members of Visa, right? So I think it was an inference agreement as well. But before the agreement, the members controlled the organization. So it was also an explicit agreement if it wasn't as well. Right. So before the agreement, it's the members themselves. There is this entity called Visa and MasterCard that exists, but the members are controlling the entity. That's right. And so they band together through the auspices of this entity and enter into this agreement that we've all seen in the complaint. Right. After the IPO, the members – you do have allegations in your complaints, in the three complaints at least, that the member banks retain a significant financial and equity interest in MasterCard Visa. That's correct. And is that – I think what Judge Tatel is asking is, is that – That also helps create an inference that they are in an express agreement, at least at the pleading stage. Because it's plausible to assume that they – since they control and have equity interest, that they have a discussion and to continue this agreement. Because if they still have an influence, they can't have the same degree of control because shares have been divvied up and doled out to the general public. But if they still have – suppose they still have significant influence, then nothing would have changed. That's correct. But if they don't have – suppose all the shares are gone and they don't have any interest any longer. Then it seems like something consequential changed. It may not mean the end of your case, but it does seem like something consequential changed because the policy then can no longer be seen as just the manifestation of an agreement between a bunch of folks who got together and said, here's our policy. Because at that point, it's no longer those folks getting together and saying, here's our policy. There's some independent entity out there that's deciding that they're going to continue the policy. But the agreement's never changed. So even though you may no longer have influence, let's assume that was the case. Wait a minute. I don't understand that. What do you mean – but you agree there is no post-IPO agreement, right? No, there is a post-IPO agreement. I thought you said you agreed there was. I'm sorry if I didn't speak clearly. There was a pre-IPO agreement. Those restraints are still in place. That agreement still exists. And the only issue is whether the banks, who are no longer members but have influence, whether they still have this agreement in place. And we say they do still have the agreement in place because the restraints still exist and there's been no withdrawal. That's our position. Is your position that even if we were to conclude that there was no kind of affirmative steps to create a new agreement, as long as there was no withdrawal from the prior agreement, that that's all that you need to show? That's correct, Your Honor. And our second position on the agreement is that even if there's no horizontal agreement, by virtue of the kind of restraints themselves. I'm sorry. Let me just focus on the first one again for a second, which is that withdrawal, I think the other side's argument would be that, well, if you're acknowledging that withdrawal would end the agreement, there was a de facto withdrawal here because everything changed and that the member institutions don't control the policy anymore. There's some independent entity that's deciding that it's going to continue this. So there effectively is a withdrawal because you just don't have the ability to continue the policy of your own volition. Somebody else has to decide that the policy's going to be continued. Well, in fact, there has been no withdrawal because, again, the restraint is in place pre-IPO and post-IPO. And yes, I'm no longer a member, but I am free to withdraw from that agreement. I am free to say I am not going to honor this agreement. I am going to price my own way. And the banks are not doing that. So that's why there's no competition because none of the member banks... How can the banks do that other than by withdrawing, by not using the Visa or Master Networks? That's correct. They would have to use other lower-cost networks. Right. But there's nothing in their original agreement that required them to use Master or Visa. It just said Master and Visa policy of requiring a standard fee, a standard cost among all ATMs. That's what they bought into, right? I mean, isn't that right? I'm not sure I follow your question. Let me try that again. Well, even under the agreement, pre-IPO, there was nothing requiring these banks. Was there anything that prohibited the banks from using other networks? No, they can use other networks. But it has to be at the same cost. Then my question is, what do you mean by the banks are free, they haven't withdrawn? What does that mean? What would they do to withdraw? They would get out of the Visa, Mastercard Network. But they could have done that before the IPO. Well, they were members of the network. But there was nothing being a member. I don't think there's anything. I'm not aware of anything, or maybe I'm wrong. Was there anything in being a member that prohibited them from using other networks? No. Okay. So then what do you mean by – I mean, there's nothing in the agreement before or even if there's one afterwards that prohibits banks from withdrawing. That's correct. But they haven't withdrawn. There's no way they can change. Pre-IPO, they had the power to change the pricing mechanism you are now objecting to. Post-IPO, they don't. That's up to Master and Visa, isn't it? Yes, but they can withdraw. Withdraw from what? From the Visa, Mastercard Network and carry ATM cards that are bugged by other lower-cost networks. But they don't want to do that because it's not in their economic interest to foster price competition among ATM operators. And their incentive is that because otherwise they enjoy having a low interchange? The banks and the Visa, Mastercard charge the highest fees for the transaction compared to the competitive ATM operators. To the ATMs, but from the bank's perspective. Well, from the bank's perspective, they get a piece of the transaction because they're – with Visa and Mastercard, some of them are – But post-IPO – so pre-IPO, they were – the member institutions said they were getting the – I mean, we can just assume it was a pass-through. I'm sure that there's complications to that, but let's just assume that. But post-IPO, they don't get the direct benefit of it anymore, I don't think, right? Because they're not – Well, some of them are equity members. But that gets back to the argument that they retain an equity stake, but – So some of them would, and others just don't want to be involved with price competition. So right now, because there's no price competition, the Visa, Mastercard has most of the market. There's very little going to the other banks. So if they withdrew and they began competition, there's a chance, right? I still don't know what you mean by withdrawal. Maybe I'm – Withdrawal means that – Could a bank that participates in the Visa, Mastercard network have more than the Visa, Mastercard bugs on their cards? Yes. Okay, so they don't have to withdraw to do that. They can do that now. But they can't – they can't – as long as they're part of the Visa, Mastercard network – Correct. Right? They can offer other network providers on the other bugs, but it has to be at the same price. Correct. But if they want to offer a competing price, they have to get out of the network. I see. That's withdrawal. Okay. And I see that I've used more of my time. Thank you. All right. May it please the Court. Ken Gallo. I represent Mastercard. I appear today on behalf of all the appellees. I will turn to the agreement portion, since that's what the Court appears to be interested in. There were not sufficient factual allegations here to establish a horizontal or a vertical conspiracy in this case. We start from the proposition – and this, I think, is undisputed – there are no factual allegations of actual communications or agreements among the banks in the way one normally thinks of a conspiracy, either during the pre-IPO period or the post-IPO period. The allegation in the pre-IPO period is that there was a structural conspiracy, essentially that the banks controlled Mastercard and controlled Visa, and because of that, they were in a structural horizontal conspiracy. That becomes important when we get to withdrawal. But the law says that merely being in control of the association and joining the association is not enough to establish a horizontal conspiracy. That's the Federal Prescription Service case in this circuit, says that membership in a pharma association, a pharmaceutical association, does not mean that every member has agreed horizontally to enforce the rules of that association. The Kendall case in the Ninth Circuit dealt exactly with this issue, Mastercard and Visa, and said the fact that there's an association structure, an ownership structure, is not a horizontal agreement among all the members of that association. The ADSAT case from the Second Circuit says the same thing. Signing up to association rules is not a horizontal or a vertical conspiracy. And why? Because the mere act of agreeing to follow the rules of the association or being in the association doesn't give rise to a horizontal conspiracy. And those cases are not adequately or really addressed in the appellant's brief, and we respectfully submit that that disposes of the pre-IPO conspiracy allegation because there's nothing beyond mere allegations of ownership and membership in the association, and that's been found not to be significant. Are those dismissal cases? They are. Kendall, I believe I am correct when I say that Kendall was, yes, a dismissal at the motion to dismiss stage. I don't remember, frankly, Your Honor, on federal prescription, and I believe that ADSAT, I think I'm correct, was a dismissal case. But the legal principle, and the pleading here is the important part, the legal principle is that being part of the association, signing up to the rules, isn't sufficient. And even if they weren't dismissal cases, Your Honor, there's no allegations beyond that here. There are conclusory allegations that the banks controlled the association, but that in and of itself is not sufficient, and that's where I started with the point that there aren't additional allegations of an actual agreement about this rule that is the subject of this lawsuit, and that's what's missing. But to be fair, especially reading the inferences in the favor of the plaintiff, as we must at this point, weren't there allegations in the various complaints more than just, well, they were a part of the association and therefore there was a conspiracy? I mean, there were what you might call rather conclusory allegations, but there were allegations that were more than that. There were allegations that they owned and controlled the association. And my point is that that in and of itself isn't sufficient, and I believe the case law supports this. The fact that realtors are, and I'll get to the Robertson case because it goes the other way, but I don't think it's relevant to our issues, but the fact that there's a governing association does not in and of itself mean there's a conspiracy. There has to be more than that. There have to be allegations of actual agreements beyond ownership, control, membership of the association or agreeing to follow the rules of the association, because otherwise it is completely consistent with a unilateral decision to join the association, and we don't apply Section 1 liability to a unilateral decision to be an owner or a member of an association. And there's nothing beyond that here, Your Honor, that's material. What more would you say? You could, for example, say the banks got together in a way that was contrary to the interest of MasterCard. For example, that's what the Robertson case versus C. Pines that the appellants rely on. If you had a separate agreement where the banks got together to do something that injured the plaintiffs and that also was contrary to the interest of MasterCard or Visa, let's say it restricted membership of the network so that you would infer from that that can't be a legitimate network action because it's contrary to the interest of the network. Now you have a separate inference could be drawn that the banks did something separate and apart that was a horizontal conspiracy, and that's what the Robertson case gets at. That was a multilisting service case, right? The realtors were members of the multilisting service. What about the Second Circuit had a Visa case? Yes. That case went to trial, and there were express findings, and I happened to be in that trial, so I know what happened. There were express findings, and there were that the banks were talked with one another about passing a rule that was directed at injuring American Express. So it was way beyond just being owners and members. In that very same case, the judge found in the other half of the opinion that the mere fact that banks sat on the boards of the associations did not indicate that there was anti-competitive conduct. The rule there, there was a very specific rule passed at a special time and that was directed at American Express and that each of the banks independently signed up for that went well beyond mere ownership interest or mere involvement in the association. So that is a very different scenario. But isn't the allegation in this case that it's not that these banks joined MasterCard or joined the association and they kind of just bought into an agreement that was preexisting. They were there when the agreement was fashioned. They were there when the rules of the association were created and that if you agree to be an owner and a member of the association, you necessarily agree to follow the rules. That is what is reasonably pled. There's nothing that says there was a separate agreement beyond being in. Right, but the complaint does say that the, it does say that the banks, just to pick up on Judge Wilkins' question, does say that the banks that were, that was a member of the organization, that's pre-IPO, quote, knew and understood that the ATM restraints would continue after the IPO. Right. There is that conclusory allegation. Well, but this is a motion to dismiss. You're correct. They may or may not be able to approve it, but what else are they supposed to say? Well, Your Honor, if I might go to that, I think that gets to the withdrawal issue if I get the essence of where you're going with that question. No, the essence of where I was going was no more than paragraph 91 of the complaint. Okay. And that's it, nothing else. Well, when I hear that allegation, what I infer from that is that that is relevant to the question of whether post-IPO they would have withdrawn from the conspiracy if they knew that the rules were going to continue. And my answer to that question, Your Honor, is to go back to where I began. The allegation was it was a structural conspiracy, that by owning the association, that gave rise to the conspiracy. There's no allegation beyond that about specific agreements on the ATM rule. Why? Because the complaint says that the member bank selected a board of directors, so they're in control. And then it says the board of directors in turn established, approved, and agreed to adhere to rules and operating regulations that required. So I take your point. If you just agree to rules and regulations, but then it says that required all member banks to fix ATM access fees at a certain level. Right. And so if you have a bunch of institutions that get together and agree to fix prices at a particular level, that's the essence of an allegation of anti-competitive agreement. Right. But, Your Honor, I would suggest to you that the federal prescription case and the Kendall case and the ADSAT case all have addressed this or similar issues. And they all have concluded that in order to distinguish a bank making a unilateral decision about what is in its interest when it joins an association and is a member of the association, and when the network passes rules, in order to distinguish between unilateral decisions of the members and the network looking out for the interest of the network, we need something additional. Right, but at that level of generality, I guess there's something to that. But if there's an allegation of fixing prices and just institutions get together and fix prices, now they do it through a vehicle of an association, but the allegation is that the institutions who are competing institutions got together and fixed prices. At that point, what more do you? Well, Your Honor, if this were anything, I think that the allegations of the complaint, the rest of the allegations of the complaint, show that this is anything and very, very far afield from a price-fixing case. If this were a traditional horizontal price-fixing case where the associations and banks were getting together and saying the banks are setting a price to a consumer, then I think I would be hard-pressed to disagree with you. But they characterize their allegations as a price-fixing allegation, but it's very, very important when one looks at the allegations of the complaint to see how far afield this is from price-fixing. Take the operator claim here. The operator claim here, which is characterized as price-fixing, is that we are charged a network fee which is too high, okay? But when one reads the complaint carefully, what becomes clear and the district court focus right in on this, when there is an ATM transaction over one of these operators' systems, the operator doesn't actually pay anything. The operator actually receives a payment. They receive interchange minus the network fee. The money is flowing the other way. The operator is being paid. But their argument is that they could make more money if they were free to charge differentially. Right. That's their argument. But my point, my only point on this scenario point, Your Honor, is that to characterize it as price-fixing is a gross mischaracterization because at the transaction point they are being paid as opposed to what one conjured when it is conjured up in your mind that price-fixing occurs. Somebody is actually paying something. It's flowing the other way. Their real complaint is that they're not being paid enough as a result of the transaction. And what I mean by that is it is not a simple horizontal price-fixing case of the kind where there's a simple allegation the banks got together and they fixed a price. It's considerably more complex than that. And the reason that's important is because one has to look at that complexity when one is assessing whether we should apply conspiracy conclusions to conduct that could just as easily be unilateral. And the Kindle and ADSAT cases, that's what they're getting at, is we don't lightly find a conspiracy, and we don't find it on the basis of a conclusory assertion without looking at the underlying economics. And the notion that this is a simple price-fix is just no one really believes that. I mean, for example, if you look at the other side of the coin, the consumer claim, the plaintiffs say the consumers would be better off because they would pay a lower access fee. Now, in a price-fix, you would think it would be the defendants that are charging the plaintiffs the access fee. Here, the operator plaintiffs are the ones that are charging the access fee to the consumer in many cases. A defendant could too, but the operator plaintiffs are the ones that put the access fee on it. When is the last time we saw a price-fixing case where one plaintiff was charging the other plaintiff the money? And the reason this is important is because it tells you this is not a simple price-fixing case and the judge in the district court was very careful not to take the bait and say, oh, this is very simple. The judge said, I have to understand plausibly what would happen in the real world if this rule didn't exist. And the rules, under the rules, the operator plaintiffs, they could charge zero to the consumer. The rule doesn't require that any fee be charged. They could charge zero. And the district court also said, I've got to understand what would actually happen. As long as they charge zero to everybody. Right, right. But my point is that it's not even the defendants in many cases. It could be a defendant. I don't want to overstate it. It could be. But one of the classes here are plaintiff operators who are the ones imposing the fee. That is a long way from a standard price-fix. It's a very complicated theory. And the judge required it to be played with plausibility for that reason. Okay. Thank you. Thank you. Did counsel have any more time? Okay. You can take two minutes. I think I heard counsel say that just because we're members of an association and we have rules does not mean that we're subject to Section 1 liability here. And the cases that we cite in our brief, including the National Society of Professional Engineers and the American Needle case itself, makes it clear that if you get together, no matter what you call yourself, and you form an agreement that limits competition, you are within Section 1. There's no membership immunity rule. So I think counsel is just wrong on that point. Second, this is a classic price-fix because consumers aren't getting the benefit. Let's take the consumers, for example. They're not getting the benefit of having people offer them lower-priced cards because the ATM plaintiffs cannot say to a consumer, I have another card I can give you. That card has an access fee of $1. Now they can do that if they also charge the same for the visa transaction because under the rule they'll have to be the same. But they can't afford to do that because of the market power of visa. The fees that visa charges, again, go into the table in the complaint, are so great that the ATM operators need to raise that access fee in order to make any profit on the charges that are coming through on the Visa MasterCard case. So this is a very serious price-fix in cases. And under the pleading rules that have been in existence as long as I've been doing antitrust cases, we satisfied standing and we satisfied what you're required to allege at this stage of the case, an agreement. The case that counsel referred to, the visa trial that you brought up, we were both counsel in that case. He said there were meetings and all kinds of evidence that came at issue in the trial. Yes, there were. That was a trial. This is a complaint. And I think we've satisfied what's required for pleading an antitrust complaint. Thank you. Okay. Thank you, gentlemen. Case is submitted.
judges: Tatel, Srinivasan, Wilkins